## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL A. CARLSON,** *et al.*, | : | **CIVIL ACTION NO. 1:15-CV-2452** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRUCE R. BEEMER, in his official** | : | |
| **Capacity as Attorney General of the** | : | |
| **Commonwealth of Pennsylvania,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiffs Michael A. Carlson and Michael J. Cranga allege that defendants Kathleen G. Kane and Jonathan A. Duecker retaliated against them for testifying before a Philadelphia County grand jury in October 2014. Specifically, plaintiffs aver that defendants denied them promotions and publicly exposed their private emails after both plaintiffs defied Kane's order not to testify. Defendants move to dismiss plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the First Amendment does not embrace plaintiffs' grand jury testimony. The court will deny the motions.

I.    **Factual Background and Procedural History**

Carlson and Cranga are special agents employed by the Pennsylvania Office of Attorney General ("OAG"). (Doc. 1 ¶¶ 14-23). At the time of defendants' alleged conduct, Kane was the Attorney General of the Commonwealth of Pennsylvania and Duecker was her chief of staff. (Id. ¶¶ 14, 26).[1]

From 2010 to 2012, the OAG investigated possible incidents of corruption involving certain public officials in Philadelphia, Pennsylvania. (Id. ¶ 27). Carlson and Cranga were "integral parts" of the investigation team for approximately eighteen months. (Id. ¶ 34). Frank Fina ("Fina"), then Chief Deputy Attorney General, served as lead attorney for the investigation and supervised both Carlson and Cranga. (Id. ¶ 35). The investigation had not yet concluded when Kane assumed office in January 2013. (Id. ¶ 37).

Kane declined to continue the investigation. (Id. ¶¶ 38, 43). After the *Philadelphia Inquirer* published an article critical of this decision, Kane publically defended her choice, claiming that the investigation was "deeply flawed and tainted by racism." (Id. ¶¶ 39-41). Kane rejected the *Inquirer*'s insinuation that her decision was politically-motivated to protect fellow Democrats. (See id. ¶¶ 39-40). Kane

---

[1] Plaintiffs sued Kane and Duecker in both their official and individual capacities. Kane resigned from the office of Attorney General effective August 17, 2016, and Duecker was terminated as chief of staff effective September 1, 2016. (Doc. 44 ¶¶ 3-4). On plaintiffs' motion, the court substituted the current Attorney General, Bruce R. Beemer, and his acting chief of staff, James A. Donohue, as official capacity defendants pursuant to Federal Rule of Civil Procedure 25(d). (Doc. 46). Kane and Duecker remain defendants in this litigation to the extent they are sued in their individual capacities.

suspected Fina as the source of the *Inquirer* article and purportedly declared "war" on Fina and those close to him. (Id. ¶¶ 41-42).

The Philadelphia District Attorney's Office subsequently assumed jurisdiction of the case and presented evidence developed during the OAG's investigation to a grand jury. (Id. ¶¶ 43-44). In October 2014, both Carlson and Cranga received subpoenas to testify before this Philadelphia grand jury. (Id. ¶ 45). Carlson and Cranga each desired the opportunity to testify, but Kelly Sekula ("Sekula"), a Senior Deputy Attorney General, advised them that the OAG would seek to quash the subpoenas. (Id. ¶ 47). Neither agent heard from the OAG again prior to their departure to Philadelphia to testify before the grand jury. (Id. ¶ 48).

Sekula called Cranga en route to Philadelphia. (Id. ¶¶ 49-50). Sekula requested that both agents "tell the supervising judge . . . that they wanted an attorney to represent them" in the grand jury proceedings. (Id. ¶ 51). Neither Carlson nor Cranga thought it necessary to secure an attorney. (Id. ¶ 55). Rather, both agents perceived the suggested action as a transparent attempt by Kane to suppress their anticipated courtroom testimony. (Id. ¶¶ 54-57).

After the agents arrived in Philadelphia, Sekula and another senior OAG attorney unsuccessfully argued to the grand jury's supervising judge that neither agent should be compelled to testify. (Id. ¶ 58). Thereafter, Carlson and Cranga testified before the grand jury concerning their involvement with and perception of the OAG investigation. (Id. ¶¶ 61-62). Both agents testified that the investigation was neither flawed nor motivated by racism as alleged by Kane. (Id. ¶¶ 63-64).

The grand jury returned three presentments recommending charges against six officials investigated by plaintiffs, and the Philadelphia District Attorney's Office filed the recommended charges.  (Id. ¶¶ 65-67).  Fina, who had by then accepted a position with the Philadelphia District Attorney's Office, emailed Carlson when Fina's office filed the last of the charges and observed that Carlson and Cranga "were key" to the charging decision.  (Id. ¶¶ 67, 70).

Plaintiffs claim that defendants retaliated against them for their grand jury testimony.  (See id. ¶ 98).  Both agents were denied promotions in April 2015 when individuals with less experience and training were promoted over them.  (See id. ¶¶ 72-87).  A former OAG human resources representative later informed the agents that Kane and Duecker had placed them on an unofficial "blacklist" as a result of their grand jury testimony.  (See id. ¶¶ 96-97).

Another grand jury began investigating allegations that Kane had surreptitiously leaked confidential OAG material to settle the score with Fina over the *Inquirer* article.  (See id. ¶¶ 109, 119).  In an emergency application to the Pennsylvania Supreme Court on November 12, 2014, Kane sought to quash the statewide grand jury investigation into her conduct.  (Id. ¶ 109).  Kane maintained that the investigation was political gamesmanship orchestrated by Fina to dissuade Kane from exposing his involvement in a developing email scandal embroiling a number of Pennsylvania public officials.  (Id. ¶ 110).  Kane attached to her filing select emails implicating Fina and his associates, including both Carlson and Cranga.  (Id. ¶¶ 111, 114).

4

The Pennsylvania Supreme Court denied Kane's emergency application, but acceded to her request that the application and attached emails be made public. (Id. ¶¶ 118-23).  Plaintiffs aver that defendants selectively disclosed their emails in further retaliation for their grand jury testimony in support of Fina's investigation. (Id. ¶¶ 112, 130).

Plaintiffs commenced the instant action with the filing of a single-count complaint (Doc. 1) on December 21, 2015.  Both agents assert a claim pursuant to 42 U.S.C. § 1983 for retaliation in violation of their First Amendment rights.  (Id. ¶¶ 131-39).  Kane and Duecker subsequently filed the instant motions (Docs. 17, 19) to dismiss.  The motions are fully briefed (Docs. 18, 20, 29, 34-35) and ripe for disposition.

## II.   Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  To test the sufficiency of the complaint, the court must conduct a three-step inquiry.  See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded.  Id. at 131; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555.  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

## III.   Discussion

Defendants raise a threefold challenge to the sufficiency of plaintiffs' allegata, contending: first, that plaintiffs' grand jury testimony is not protected "citizen speech" as defined by the Supreme Court of the United States in Garcetti v. Ceballos, 547 U.S. 410 (2006); second, that the respective interests balancing test

6

set forth by the Court in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), does not protect public employee grand jury testimony when same is prohibited by the speaker's employer; and *third*, assuming *arguendo* that this court resolves both inquiries in plaintiffs' favor, defendants must receive qualified immunity because such protections were not "clearly established" at the time of the challenged actions in October 2014.  The court addresses all three arguments through the prism of the qualified immunity doctrine.

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 244-45 (2009).  No liability will attach if a reasonable actor could have believed the challenged conduct was in compliance with settled law.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Springer v. Henry</u>, 435 F.3d 268, 280 (3d Cir. 2006). The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery." <u>Pearson</u>, 555 U.S. at 231-32 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 n.2 (1987)).  The defense generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  The burden to establish qualified immunity rests with the defendant.  <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, based on the facts alleged, a constitutional right has been violated and, if so, whether the right was "clearly established" at the time of the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  A court may begin its qualified immunity analysis with either prong.  See Pearson, 555 U.S. at 237.  We begin with the first.

### A.    Violation of a Constitutional Right

To prevail on a First Amendment retaliation claim, plaintiffs must allege, and ultimately prove, that their speech is protected by the First Amendment and that the speech was a "substantial or motivating factor" in defendants' alleged retaliatory action.  Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014).  If plaintiffs sufficiently establish these threshold elements, the burden shifts to the employer to demonstrate that it would have taken the same action if the speech had not occurred.  Id.  Defendants dispute only the first of these elements in their motions, contending vigorously that the First Amendment offers no protection to plaintiffs' grand jury testimony.

A three-step inquiry determines whether employee speech is protected by the First Amendment.  *First*, the employee must have spoken "as a citizen," not an employee, under the test established by the Supreme Court in Garcetti and reaffirmed in Lane v. Franks, 573 U.S. __, 134 S. Ct. 2369 (2014); *second*, the citizen speech must involve a matter of "public concern"; and *third*, the government must lack "adequate justification" for treating employees differently from the general

public under the familiar <u>Pickering</u> balancing test.  <u>Dougherty</u>, 772 F.3d at 987.

Defendants do not dispute that plaintiffs' speech involved a matter of public

concern.  (<u>See</u> <u>generally</u> Docs. 18, 20, 34-35).  The court addresses the parties'

arguments concerning the first and third elements *seriatim*.

### 1.    *Grand Jury Testimony as "Citizen Speech"*

The Supreme Court in <u>Garcetti</u> announced the test for determining whether

a public employee's speech constitutes the type of "citizen speech" envisaged by the

First Amendment.  The Court held that when public employees speak pursuant to

their official duties, they speak not as "citizens," but duty-bound employees whose

comments the Constitution "does not insulate." <u>Garcetti</u>, 547 U.S. at 421.  The rule

of <u>Garcetti</u> endeavors to "respect the needs of government employers attempting to

perform their important public functions" while contemporaneously "promot[ing]

the individual and societal interests served when employees speak as citizens on

matters of public concern." <u>Id.</u> at 420.

Applying these tenets to the facts before it, the Supreme Court in <u>Garcetti</u>

determined that penning an internal memorandum fell within the scope of a county

prosecutor's official duties, precluding First Amendment protection.  <u>See</u> <u>id.</u> at 421.

The Court concluded that the plaintiff clearly "spoke as a prosecutor fulfilling a

responsibility to . . . his supervisor" when authoring the memorandum, answering

the "official duties" inquiry in the affirmative.  <u>Id.</u>  The Justices left for the court of

appeals on remand a determination whether later courtroom testimony concerning

the issues raised in the memorandum constituted protected "citizen speech." <u>See</u>

<u>id.</u> at 443-44 (Souter, J., dissenting).

The Third Circuit Court of Appeals resolved the question left unanswered by

<u>Garcetti</u> two years later in <u>Reilly v. City of Atlantic City</u>, 532 F.3d 216 (3d Cir. 2008).

Therein, the Third Circuit first acknowledged that <u>Garcetti</u> provides no "express

instruction" on the application of its delimitation to a public employee's courtroom

testimony.  <u>Id.</u> at 231.  In the absence of precise guidance, the <u>Reilly</u> court held fast

to <u>Garcetti</u>'s spirit, especially its stated desire to promote "the individual and

societal interests served when citizens play their vital role in the judicial process."

<u>Id.</u> (quoting <u>Garcetti</u>, 547 U.S. at 420).

The panel thoroughly canvassed its own decisions as well as those of

sister circuits and the Supreme Court.  The resulting disquisition underscored the

sacrosanctity of courtroom testimony and the corresponding need to shield it from

retaliatory employer discipline.  <u>See</u> <u>id.</u> at 229-31 (collecting cases).  The <u>Reilly</u>

decision extolled the axiom that "every citizen . . . owes to his society the duty of

giving testimony to aid in the enforcement of the law."  <u>Id.</u> at 228.  The panel ruled

that the societal import of truthful courtroom testimony transcends conventional

concerns of employee fidelity to the employer: "[T]he act of offering truthful

testimony is the responsibility of *every* citizen, and the First Amendment protection

associated with fulfilling that duty of citizenship is not vitiated by one's status as a

public employee."  <u>Id.</u> at 231 (emphasis added).

Curiously, Kane and Duecker ignore <u>Reilly</u>—controlling Circuit precedent—in their opening briefs. (<u>See</u> Docs. 18, 20). In reply briefs, defendants suggest that <u>Reilly</u> is inapposite because it did not involve an element of "insubordination" that presents *sub judice*. (Doc. 34 at 2-8; Doc. 35 at 2-8). This factual distinction might appertain if <u>Reilly</u> had applied a traditional <u>Garcetti</u> analysis before extending citizen speech protection to the employee's courtroom testimony. It did not. Citing the significance of the speech in question, the court forewent an "official duties" inquiry and granted unreserved citizen speech status to courtroom testimony. Accordingly, defendants' argument is most appropriately considered *infra* in the context of the <u>Pickering</u> balancing test.

Defendants also intimate that the Third Circuit's decision in <u>Beckinger v. Township of Elizabeth</u>, 434 F. App'x 164 (3d Cir. 2011), curtailed the scope of <u>Reilly</u>. Defendants claim that, in light of <u>Beckinger</u> and "the Supreme Court's consistent protection of a public employer's right to control its employees," <u>Reilly</u> is "unavailing." (Doc. 34 at 8; Doc. 35 at 8). As a threshold matter, <u>Beckinger</u> is a nonprecedential decision. The Third Circuit Court of Appeals "steadfastly attempt[s] to discourage" judges and counsel from relying on such opinions. <u>Jamison v. Klem</u>, 544 F.3d 266, 279 n.11 (3d Cir. 2008). Nonprecedential decisions "have value only to the trial court or the parties." Third Circuit Internal Operating Procedure 5.7. Hence, <u>Beckinger</u> cannot supplant <u>Reilly</u> in the manner defendants suggest.

11

Moreover, defendants' reliance on <u>Beckinger</u> is flawed on a substantive ground. In <u>Beckinger</u>, a Third Circuit panel cited the Supreme Court's decision in <u>Borough of Duryea v. Guarnieri</u>, 564 U.S. 379 (2011), for the proposition that "courts must be reluctant to interfere in what is essentially 'a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" <u>Beckinger</u>, 434 F. App'x at 169 (quoting <u>Guarnieri</u>, 564 U.S. at 386). The panel then engaged in a traditional <u>Pickering</u> balancing test, weighing an officer's interest in testifying against department policy disfavoring that testimony. <u>Id.</u>

The "reluctance" invited by the <u>Beckinger</u> court must be placed in proper context. Contrary to defendants' suggestion, the <u>Guarnieri</u> Court did not hold that courts must be reluctant to assign an initial "citizen speech" designation in order to protect a public employer's interest in controlling its employees. *Per contra*, the Court simply reiterated the unexceptional proposition that, when an employee *does not* speak as a citizen, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision" taken by an employer in response to employee speech. <u>Guarnieri</u>, 564 U.S. at 386. Defendants' suggestion that either decision circumscribes the principal holding of <u>Reilly</u> conflates two related but distinct components of First Amendment jurisprudence: the initial inquiry, under <u>Garcetti</u> and its progeny, whether speech constitutes "citizen speech," and the ultimate inquiry, under <u>Pickering</u>, whether that citizen speech receives First Amendment protection. <u>See</u> <u>Dougherty</u>, 772 F.3d at 987.

Pursuant to <u>Reilly</u>, courtroom testimony is categorically "citizen speech" as contemplated by the First Amendment.  <u>Reilly</u>, 532 F.3d at 231.  Carlson's testimony and Cranga's testimony fall squarely within this category of citizen speech.  As noted *supra*, defendants do not dispute that both agents' grand jury testimony involved a matter of public concern.  Consequently, the court proceeds to the critical balancing of interests dictated by <u>Pickering</u> and its progeny.

### 2.    *Balancing Employer and Employee Interests*

Our finding that Carlson and Cranga spoke as citizens on a matter of public concern does not automatically equate to First Amendment protection.  <u>Dougherty</u>, 772 F.3d at 990-91.  Only if the <u>Pickering</u> balancing test tips in plaintiffs' favor are they shielded from employer discipline.  <u>Id.</u>; <u>McGreevy v. Stroup</u>, 413 F.3d 359, 365 (3d Cir. 2005).  Defendants suggest that Kane's sweeping interest in "maintain[ing] control over her workforce and their activities" extinguishes any competing private or public interest and endures "[w]hether the workforce believes in or agrees with her policies" or not.  (Doc. 18 at 16; Doc. 20 at 16).  Plaintiffs rejoin that the nature of their grand jury testimony—which was "integral" to a successful public corruption prosecution—defeats the generic interests identified by the defendants.  (Doc. 29 at 23-24).

Under <u>Pickering</u>, a court must balance the government's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees," with the employee's interests, as a citizen, in commenting on matters of public concern.  <u>Pickering</u>, 391 U.S. at 568; <u>Dougherty</u>, 772 F.3d at 990-91.  Courts

measure the potential disruption of personnel management by querying, *inter alia*, whether speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Dougherty, 772 F.3d at 991 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Employee speech concerning government impropriety and public corruption has traditionally "occupie[d] the highest rung of First Amendment protection." Id. (quoting Swineford v. Snyder Cty., 15 F.3d 1258, 1274 (3d Cir. 1994)).  The higher elevated the First Amendment's protections, the stronger an employer's "showing of disruption must be." Id. (citing McGreevy, 413 F.3d at 365).  Hence, employers attempting to justify suppression or punishment of speech aimed at exposing public corruption "bear a truly heavy burden." McGreevy, 413 F.3d at 365.

Defendants have not met this burden.  In their principal briefs, defendants offer only the bald conclusion that the "Attorney General's interest in this situation is obvious." (Doc. 18 at 16; Doc. 20 at 16).  In response to plaintiffs' robust opposition, defendants cursorily assert specific interests in avoiding workplace "disruption" and conserving public resources.  (Docs. 34 at 14-17; Doc. 35 at 14-17). Defendants rely heavily on Green v. Philadelphia Housing Authority, 105 F.3d 882 (3d Cir. 1997), for the proposition that law enforcement agencies have a "particular interest" in control over their employees' speech.  Green is facially relevant *sub judice* but it is not directly on point.

14

In <u>Green</u>, the Third Circuit held that a police officer's prospective character testimony on behalf of a friend accused of organized crime was decidedly "citizen speech," but nonetheless found that the department's interest in preserving its public reputation outweighed the officer's interest in testifying. <u>Green</u>, 105 F.3d at 885-88. The court observed that, because Green's appearance was voluntary, the public interest in his testimony "is somewhat more limited" than it might otherwise be. <u>Id.</u> at 888. Measured against Green's personal interest in testifying, the court favored the department's stated concern that an officer's association with an organized crime associate may "bring discredit upon [the department], endanger the plaintiff[,] and tarnish the image of" the department. <u>Id.</u> The court also found compelling the fact that Green conceded resulting disruption, to wit: other officers "would not want to work with [him] because they were afraid that [he] knew people in the mob." <u>Id.</u> at 888-89.

<u>Green</u> is distinct. First, <u>Green</u> was decided on a motion for judgment as a matter of law, with a full trial record at the court's disposal. Kane and Duecker's nonspecific assertions of resource conservation and "disruption" to the general "functioning of the office" are merely allegations which, considered against the complaint's competing narrative, fail to tip the balance in defendants' favor. (<u>See</u> Doc. 34 at 14, 16-17; Doc. 35 at 14, 16-17). The nature of the speech in <u>Green</u> is also distinguishable: Carlson and Cranga testified against public corruption, whereas Green appeared on behalf of an organized crime suspect.

Most significantly, <u>Green</u> differentiates itself by the context of the speech in question.  The court pointedly observed that Green appeared on his own volition and not pursuant to a subpoena.  <u>Green</u>, 105 F.3d at 888.  The court opined that "the public interest favoring subpoenaed testimony"—like Carlson and Cranga's grand jury testimony—"is *even stronger*."  <u>Id.</u> (citing <u>Pro v. Donatucci</u>, 81 F.3d 1283, 1290 (3d Cir. 1996)) (emphasis added).  Rather than defeating plaintiffs' claims as Kane and Duecker allege, <u>Green</u> supports their claims by essential distinction.[2]

For all of these reasons, we find <u>Green</u> to be inapposite.  Carlson and Cranga, and the public at large, share a vital interest in speech on matters of public corruption.  This interest outweighs defendants' generic interests in controlling employees and conserving government resources.  Plaintiffs have sufficiently stated a First Amendment retaliation claim against Kane and Duecker.

### B.    Clearly Established Law

The second qualified immunity prong tasks the court to determine whether the right in question was "clearly established" at the time of the alleged violation.  <u>See</u> <u>Spady</u>, 800 F.3d at 637.  A court must "frame the precise contours" of the right at issue before assessing whether that right was clearly established at the relevant

---

[2] In the context of a <u>Pickering</u> balancing inquiry, we reject any reliance on the Third Circuit's nonprecedential decision in <u>Beckinger</u> for similar reasons. In <u>Beckinger</u>, the police department adopted a policy prohibiting its officers from attending or testifying at hearings in support of parking citations.  <u>Beckinger</u>, 434 F. App'x at 165-67.  The <u>Beckinger</u> court grounded its *ratio decidendi* in deference to the public employer's interest in effective operations; the panel expressly distinguished its factual scenario from cases—like this one—which concern "an employer's retaliation based on the *substance* of testimony."  <u>Id.</u> at 169 (emphasis added).  <u>Beckinger</u>, like <u>Green</u>, is factually distinct both in the nature and context of the employee testimony and the strength of the employer's established interest.

16

time.  Id. at 638.  Courts must exercise care "not to define clearly established law at a high level of generality."  al-Kidd, 563 U.S. at 742.  Rather, we endeavor to frame the right at issue in light of the specific context of the matter at bar.  See Spady, 800 F.3d at 638 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001); Anderson, 483 U.S. at 639).

A Section 1983 plaintiff need not produce a directly analogous case to prove that a right is clearly established, but must identify "existing precedent" which places the "constitutional question beyond debate."  al-Kidd, 563 U.S. at 741.  Our ultimate inquiry is whether the state of the law at the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional.  L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 248 (3d Cir. 2016).

Explicit Third Circuit precedent answers this inquiry in the affirmative.  The court in Reilly confirmed that "the protected status of courtroom testimony" had been clearly established for more than a decade at the time of its decision in 2008.  Reilly, 532 F.3d at 232 (citing Pro, 81 F.3d at 1291-92; Green, 105 F.3d at 887).  That subpoenaed courtroom testimony constitutes "citizen speech" under the First Amendment was clearly established at the time Carlson and Cranga testified before the Philadelphia grand jury in October 2014.  We decline defendants' request to circumvent binding Third Circuit precedent.  Neither Kane nor Duecker is entitled to qualified immunity.

## IV.   <u>Conclusion</u>

The court will deny both defendants' motions to dismiss.  An appropriate

order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        December 21, 2016